Joel E. Tasca
Nevada Bar No. 14124
Justin A. Shiroff
Nevada Bar No. 12869
BALLARD SPAHR LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617
Telephone: (702) 471-7000
Facsimile: (702) 471-7070
E-Mail: tasca@ballardspahr.com
E-Mail: shiroffj@ballardspahr.com

Attorneys for American Broadcasting Cos., Inc., Cable News Network, Inc., Chesapeake Media I, LLC, d/b/a KSNV-TV, Los Angeles Times Communications, LLC, The New York Times Company, and WP Company LLC d/b/a The Washington Post

Margaret A. McLetchie
Nevada State Bar No. 10931
Alina M. Shell
Nevada State Bar No. 11711
McLetchie Shell, LLC
701 E. Bridger Ave., Suite 520
Las Vegas, NV 89101
Telephone: (702) 728-5300
Fax: (702) 425-8220
Email: maggie@nvlitigation.com
Email: alina@nvlitigation.com

Attorneys for Las Vegas Review-Journal and Associated Press

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| IN RE: SEALED WARRANT AFFIDAVITS FOR THE SEARCH OF 1372 BABBLING BROOK COURT, MESQUITE, NEVADA AND ANY OTHER SEARCH WARRANTS CONNECTED TO STEPHEN A. PADDOCK OR THE CRIMES COMMITTED OCTOBER 1, 2017 AT THE ROUTE 91 HARVEST COUNTRY MUSIC FESTIVAL | Case No. _____<br><br>PETITION TO UNSEAL SEARCH WARRANT APPLICATIONS AND ASSOCIATED JUDICIAL RECORDS |

DMWEST #17191047 v4

Pursuant to LR IA-10-5(b), American Broadcasting Companies, Inc. ("ABC"), Cable News Network, Inc. ("CNN"), Chesapeake Media I, LLC, d/b/a KSNV-TV ("KSNV-TV"), Los Angeles Times Communications, LLC ("*Los Angeles Times*"), The New York Times Company ("*New York Times*"), and the WP Company LLC d/b/a The Washington Post ("*The Washington Post*"), by and through their counsel BALLARD SPAHR LLP, and the Las Vegas Review-Journal ("Review-Journal") and the Associated Press ("AP"), by and through their counsel McLetchie Shell, LLC, (collectively "Petitioners"), respectfully petition this Honorable Court to unseal the affidavit(s) of probable cause in support of one or more warrants issued by the Court and authorizing agents of the Federal Bureau of Investigation (FBI) to search the premises located at 1372 Babbling Brook Court, Mesquite, Nevada and any other locations connected with the investigation of Stephen Paddock and/or the crimes committed on October 1, 2017 against people attending the Route 91 Harvest Country Music Festival in Las Vegas ("the Records").

Introduction

On October 1, 2017, the worst mass shooting in this nation's history occurred in this City. Those tragic events are well-known to this Court and need not be recounted in any detail here.

As has previously been reported,[1] FBI agents conducted a search of the above-referenced premises, pursuant to one or more warrants issued by this Court, as part of the joint state-federal investigation into the multiple homicides committed by Stephen Paddock, who also died that night. On information and belief, the warrant(s), along with an inventory or inventories, have been returned to the Magistrate Judge who issued them, pursuant to Fed. R. Crim. P. 41(f)(1)(D), who then forwarded those papers to the Clerk of the Court pursuant to Fed. R. Crim. P. 41(i).

On November 1, 2017, undersigned counsel sought to confirm that the Records are under seal. The Clerk of the Court would neither confirm nor deny that any warrants have been issued by this Court. The Petitioners, on behalf of themselves and their readers, viewers, and listeners,

---

[1] *See, e.g.*, Kenneth Moton & James Hill, *FBI Searching Nevada house of Las Vegas Gunman,* ABC News (Oct. 8, 2017), http://abcnews.go.com/US/fbi-searching-nevada-house-las-vegas-gunman/story?id=50358660.

DMWEST #17191047 v4                           2

therefore respectfully petition this Court to enter an Order directing the Clerk to unseal the Records.

The grounds for the relief sought in this Petition are set forth in the Memorandum of Points and Authorities below, as well as any exhibits attached hereto, the papers on file in this Court, and any evidence to be further developed in these proceedings.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

Under both the First Amendment and federal common law, the public (including Petitioners) enjoys a qualified right to inspect and copy judicial records on file with this Court. That right of public access may be overcome only upon an evidentiary showing that continued sealing is necessary to protect a compelling state interest "of the highest order" *and* that no alternative means – short of blanket sealing – is available that will adequately protect that interest.

Where, as here, the investigating law enforcement authorities have publicly announced that the only suspect in the crimes under investigation is deceased, and, therefore, no criminal charges will be filed,[2] no such showing can be made. Accordingly, under settled precedent, the affidavits of probable cause and search warrant returns on file in this Court should immediately be unsealed, in their entirety.

---

[2] *See, e.g.*, Press Release of Oct. 2, 2017, Las Vegas Metro. Police Dep't ("The Las Vegas Metropolitan Police Department identified *the lone suspect* involved in the late night mass shooting on the Las Vegas Strip") (emphasis added), https://www.lvmpd.com/en-us/Press%20Releases/PO%20235%2010-02-17.pdf; Richard Winton, *From the 32nd Floor, Las Vegas Gunman Caused Mass Carnage Despite Security Measures at Concert*, L.A. Times (Oct. 2, 2017) ("Authorities said they believe Stephen Paddock, 64, acted alone")*,* http://www.latimes.com/local/lanow/la-na-shooting-las-vegas-sniper-tactics-20171002-story.html; Associated Press, *Laptop in Las Vegas Shooter's Suite Was Missing Hard Drive*, N.Y. Times (Oct. 25, 2017) ("Police and the FBI have said they believe he acted alone."), https://www.nytimes.com/aponline/2017/10/25/us/ap-us-las-vegas-shooting-costs.html.

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

**Argument**

**I.     The Petitioners Have the Right to Seek Unsealing of the Records**

Each of the Petitioners[3] is engaged in gathering news and other information on matters of public concern, including the decisions of this Court, and the actions of federal, state, and local law enforcement agents, and disseminating that information on various platforms—print, broadcast, cable, internet and mobile devices—to the general public.

Petitioners appear before this Court on their own behalf, as members of the public, entitled to the rights afforded them by the Constitution of the United States, the Nevada State Constitution, all applicable statutes, and the common law. *See Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 609 n.25 (1982) (recognizing press' right to be heard prior to closure of criminal trial); *Phoenix Newspapers, Inc. v. U.S. Dist. Ct.*, 156 F.3d 940, 949 (9th Cir. 1998) (holding that the press must be afforded an opportunity to object to closure of court proceedings); *Associated Press v. Dist. Ct.*, 705 F.2d 1143, 1145 (9th Cir. 1983) (recognizing press' standing to assert the public's First Amendment right to inspect documents on file in a criminal case before trial).

In addition, Petitioners appear on behalf of the broader public that receives the news and information that they gather and disseminate. *See, e.g., Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573-74 (1980) (in providing coverage of court proceedings, the print and electronic media function "as surrogates for the public"). As the court observed in *California ex rel. Lockyer v. Safeway, Inc.*, 355 F. Supp. 2d 1111, 1124 (C.D. Cal. 2005), in unsealing documents at the request of a newspaper, "the press has historically served as a monitor of . . . the courts, and it plays a vital role in informing the citizenry on the actions of its government institutions"); *see also Courthouse News Serv. v. Planet*, 750 F.3d 776, 786 (9th Cir. 2014) (the press "bring[s] to bear the beneficial effects of public scrutiny upon the administration of justice.") (quoting *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 491-92 (1975)); *see also Oregonian Publ'g Co. v. Dist. Ct*., 920 F.2d 1462, 1465 (9th Cir. 1990) (recognizing that "[u]nder the first amendment, the press and the public have a presumed right of access to court proceedings and

---

[3] A full description of the each of the Media Petitioners is set forth in **Appendix A**.

documents"); *Mendez v. City of Gardena*, 222 F. Supp. 3d 782, 791-92 (C.D. Cal. 2015) (granting media intervenor's motion to unseal court records in civil lawsuit), *appeal dismissed*, 677 F. App'x 342 (9th Cir. Feb. 13, 2017).

## II. The First Amendment Right of Public Access Attaches to the Records

Several federal courts have recognized that the public right of access to court records fully extends to search warrant applications. For example, the U.S. Court of Appeals for the Eighth Circuit has held:

> *[T]he first amendment right of public access does extend to the documents filed in support of search warrant applications.* First, although the process of issuing search warrants has traditionally not been conducted in an open fashion, search warrant applications and receipts are routinely filed with the clerk of court without seal. Under the common law[,] judicial records and documents have been historically considered to be open to inspection by the public. Second, public access to documents filed in support of search warrants is important to the public's understanding of the function and operation of the judicial process and the criminal justice system and may operate as a curb on prosecutorial or judicial misconduct.

*In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 573 (8th Cir. 1988) (emphasis added) (citations omitted); *see also In re Application of N.Y. Times Co. for Access to Certain Sealed Court Records*, 585 F. Supp. 2d 83. 90-94 (D.D.C. 2008) (unsealing search warrants relating to the 2001 anthrax attacks in and around Washington, D.C. after an investigation into those crimes had identified a sole suspect, who, as here, had committed suicide); *In re Search Warrants Issued on June 11, 1988, For the Premises of Three Buildings at Unysis, Inc.*, 710 F. Supp. 701, 704 (D. Minn. 1989) ("*Unisys*") ("The first amendment right of public access extends to the [search warrant applications] sealed in this matter.").

Similarly, in the Ninth Circuit, warrant affidavits on file with the Court in connection with a fully executed search warrant, are subject to a strong presumption of public access as soon as either (a) the criminal investigation has been completed (*i.e.*, authorities have announced that no [further] charges will be filed), or (b) an indictment has been returned. *See Times Mirror Co. v. United States*, 873 F.2d 1210, 1221 (9th Cir. 1989); *United States v. Bus. of Custer Battlefield Museum & Store*, 658 F.3d 1188, 1196 (9th Cir. 2011) ("*Custer Battlefield Museum*") (without reaching whether the First Amendment applies, holding that a "common law right of access

[applies] to warrant materials after an investigation has been terminated."); *see also In re Documents 1, 2, and 3 The Search Warrant and Supporting Affidavits Relating to Theodore John Kaczynski*, No. MCR-96-6-H-CCL, 1996 WL 343429, at *3-4 (D. Mont. Apr. 10, 1996) (upon reconsideration after "the return of the search warrant [had] been filed and the investigation apparently [had] been completed," but before the indictment, ordering the unsealing of partially redacted warrant affidavits for the cabin of the suspected Unabomber).

Applying this precedent, United States District Court for the District of Arizona unsealed probable cause affidavits in another high profile shooting case under circumstances similar to those presented here. In *United States v. Loughner*, the court found that the First Amendment required the unsealing of the warrant affidavits issued in the wake of the shooting of a United States Congresswoman and the killing of a federal judge and five others, by Jared Lee Loughner, even though the investigation had not concluded. 769 F. Supp. 2d 1188 (D. Ariz. 2011). The court recognized that once the investigation into the identity of the only responsible party was effectively completed (authorities had announced that no further charges were to be filed), "[t]here [was] no real danger at [that] point that disclosure of the warrant materials [would] jeopardize the investigation." *Id.* at 1191. The court also observed that there was both a tradition of providing public access to such records in such circumstances, and a strong public function performed by providing access: "Public scrutiny of the search warrant process . . . can shed light on how and *why a warrant was obtained*, and thereby further the public's interest in understanding the justice system." *Id.* at 1194 (emphasis added). "Permitting inspection of the search warrants [and] the accompanying affidavits . . . will further public understanding of the response of government officials," the court observed, "and allow the public to judge whether law enforcement functioned properly and effectively[.]" *Id.*

The *Loughner* court quoted extensively from Chief Justice Burger's opinion for the Court in *Richmond Newspapers*, which explains in more detail why the public needs to understand what law enforcement is doing in the *immediate* aftermath of an enormous tragedy:

> When a shocking crime occurs, a community reaction of outrage and public protest often follows. Thereafter the open processes of justice serve an important

> prophylactic purpose, providing an outlet for community concern, hostility, and emotion. . . .
>
> The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is done in a corner or in any covert manner.   . . .   [I]t is important that society's criminal process satisfy the appearance of justice, and the appearance of justice can best be provided by allowing people to observe it.

*Richmond Newspapers*, 448 U.S. at 571-72 (emphasis added) (internal marks and citations omitted).

Under the above precedents, the First Amendment right of public access attaches to the Records in this case.  Just as in the New York Times anthrax investigation above, here both state and federal law enforcement agencies have publicly announced that *the only suspect* in crimes of October 1, 2017 is deceased.[4]  And, just as in *Loughner* (and *Kaczynski*), authorities have declared that the ongoing investigation is not directed toward identifying any accomplice or other criminal suspect.

## III. No Showing Can Be Made That Continued Sealing of the Records Is Justified Under the Applicable First Amendment Standard

### A. The Standard for Sealing Judicial Records Under the First Amendment is Daunting

While the First Amendment right of access is a qualified right, not an absolute one, any party seeking to abridge the access right must meet a heavy constitutional burden.  The proponent of continued sealing must establish, and the Court must expressly find, that "'(1) [sealing] serves a compelling interest; (2) there is a substantial probability that, in the absence of [sealing], this compelling interest would be harmed; and (3) there are no alternatives to [sealing] that would adequately protect the compelling interest.'" *Phoenix Newspapers*, 156 F.3d at 949 (citation omitted).

Before granting a motion to limit public access, the Court must "make specific factual findings" that "satisfy all three substantive requirements for [sealing]."  *Id.* at 950; *see also Oregonian Publ'g Co.*, 920 F.2d at 1466 ("An order of closure should include a discussion of the

---

[4] *See supra* at 3 n.2.

interests at stake, the applicable constitutional principles and the reasons for rejecting alternatives, if any, to closure." (citation omitted)).  Where such findings are made, moreover, any denial of public access must be narrowly tailored in time and scope, and must be effective in protecting the compelling interest at stake.  *See Press-Enterprise Co. v. Super. Ct.*, 478 U.S. 1, 13-14 (1986) ("*Press-Enterprise II*") (requiring "on the record findings . . . *demonstrating* that 'closure is . . . narrowly tailored to serve [the compelling] interest," and "that closure *would prevent*" the harm asserted (emphasis added)); *Associated Press*, 705 F.2d at 1146 ("there must be 'a substantial probability *that closure will be effective* in protecting against the perceived harm'" (emphasis added) (citation omitted)).

### B. No Showing Can Be Made That Satisfies The First Amendment Standard

Here, no party has demonstrated that sealing of the Records is necessary to protect any compelling state interest.  The law enforcement authorities in charge of the criminal investigation into the October 1 massacre have publicly declared that the deceased shooter, Stephen Paddock, acted alone.[5]  Although the criminal investigation that prompted the FBI to seek and obtain the warrants from this Court is still ongoing, it cannot credibly be claimed to be directed toward the future filing criminal charges against any other suspect.  *See supra* at 3 n.2.

Under these circumstances, there is no "compelling" state interest that overrides the public's constitutionally guaranteed right of access to the Records.

### C. Less Restrictive Means – Other Than Blanket Sealing – Are Readily Available

Even if the Court were to find (in record findings, as the First Amendment requires) that the criminal investigation remains "ongoing" *and* that disclosure of the Records presents a substantial likelihood of interference with that investigation, the Court must then further find that no alternative means, less restrictive than blanket sealing of the Records, would adequately protect that interest.  *See Richmond Newspapers*, 448 U.S. at 580-81 (holding that order closing a courtroom violated the First Amendment where "no inquiry was made as to whether alternative solutions would have met the need to ensure fairness"); *Press-Enterprise II*, 478 U.S. at 14

---

[5] *See supra* at 3 n.2.

1  (holding that trial court had committed constitutional error because it "failed to consider whether
2  *alternatives short of complete closure* would have protected the interests of the accused"
3  (emphasis added)); *Phoenix Newspapers, Inc.*, 156 F.3d at 949 (proponent of sealing must
4  demonstrate that "there are no alternatives to closure that would adequately protect the
5  compelling interest" (citation omitted)).
6        Accordingly, courts must treat the blanket sealing of judicial records as a last resort – one
7  they can employ only *after* engaging in a thorough analysis of reasonable alternatives, including
8  redaction, and concluding that none of those alternatives would be sufficient to protect the
9  compelling interest at stake.  *See, e.g.*, *United States v. Aref*, 533 F.3d 72, 82 (2d Cir. 2008) ("it
10 is the responsibility of the district court to ensure that sealing documents to which the public has
11 a First Amendment right is no broader than necessary"); *Kasza v. Whitman*, 325 F.3d 1178, 1181
12 (9th Cir. 2003) (where release of court records poses risk to national security, "[p]ublic release of
13 redacted material is an appropriate response"); *In re NBC,* 828 F.2d 340, 346-47 (6th Cir. 1987)
14 (vacating order sealing pleadings and exhibits, and remanding for consideration of less restrictive
15 alternatives); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1074 (3d Cir. 1984) (district court
16 abused discretion where it "failed to consider less restrictive means to keep this information from
17 the public"); *see also Unysis*, 710 F. Supp. at 705 ("Where redaction [of warrant applications] is
18 required . . . it must be narrowly tailored to allow as much disclosure as is feasible.").
19       In sum, no showing can be made that unsealing the Records poses a substantial
20 probability of harm to a state interest of the highest order.  And, even if the Court were to
21 conclude that such a showing has been made by the Government, the Court must also find that
22 disclosure of a redacted version of the Records will not adequately protect that compelling state
23 interest.

      **D.    The Public's Right of Access to Judicial Records Requires Contemporaneous Access**

26       It is firmly established that once a First Amendment right of access attaches to a judicial
27 proceeding or judicial records, the public enjoys a right of contemporaneous access.  *See, e.g.*,
28 *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126-27 (2d Cir. 2006) ("Our public access

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

cases and those in other circuits emphasize the importance of *immediate* access where a right of access is found." (emphasis added) (citations omitted)); *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994) (public access to documents in court's file "should be immediate and contemporaneous").

Because the public's right of access is triggered the moment a document is filed with the Court, any delays in providing such access are, in effect, denials, even though they may be limited in time. *See, e.g.*, *Associated Press*, 705 F.2d at 1147 (holding that a 48-hour delay in access constituted "a total restraint on the public's first amendment right of access even though the restraint is limited in time"); *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 507 (1st Cir. 1989) ("even a one to two day delay impermissibly burdens the First Amendment"); *Courthouse News Serv. v. Jackson*, No. H-09-1844, 2009 WL 2163609, at *3-4 (S.D. Tex. July 20, 2009) (24 to 72 hour delay in access to civil case-initiating documents was "effectively an access denial and is, therefore, unconstitutional").

As the Supreme Court has observed, "[d]elays imposed by governmental authority" are inconsistent with the press' "traditional function of bringing news to the public promptly." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 560-61 (1976).

Accordingly, any unnecessary delay in unsealing the Records at issue would violate the Petitioners' rights under the First Amendment.

**IV.     In the Alternative, The Records Should Be Unsealed Under the Common Law**

Even apart from the First Amendment, the federal common law provides an independent grounds for the public's right to access judicial records. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) ("the courts of this country recognize a general right to inspect and copy . . . judicial records and documents"); *In re NBC*, 653 F.2d 609, 612 (D.C. Cir. 1981) ("existence of the common law right to inspect and copy judicial records is indisputable"); *Phoenix Newspapers*, 156 F.3d at 946 (holding that the common law creates "a strong presumption" in favor of general public access to records).

The common law access right "is not some arcane relic of ancient English law," but rather "is fundamental to a democratic state." *United States v. Mitchell*, 551 F.2d 1252, 1258

(D.C. Cir. 1976), *rev'd on other grounds sub nom. Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589.  The common law right of access to judicial records exists to ensure that courts "have a measure of accountability" and to promote "confidence in the administration of justice."  *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).

Courts applying the common law right of public access to judicial records have required a party seeking to deny that right to meet a rigorous standard, not unlike that applied under the First Amendment.  *See, e.g., Balt. Sun Co. v. Goetz*, 886 F.2d 60, 65-66 (4th Cir. 1989) (requiring party seeking to keep warrant affidavits under seal to demonstrate that "sealing is 'essential to preserve higher values and is narrowly tailored to serve that interest' [and] the judicial officer must consider alternatives to sealing the documents. This ordinarily involves disclosing some of the documents or giving access to a redacted version." (citations omitted)).[6] Thus, in applying the common law standard to the sealing of warrant materials, the Ninth Circuit has held that "[a] party seeking to seal a judicial record  . . . bears the burden of overcoming this *strong presumption* [in favor of disclosure] by ... articulat[ing] *compelling* reasons ... that outweigh the general history of access and the public policies favoring disclosure."  *Custer Battlefield Museum*, 658 F.3d at 1194-95 (internal marks and citations omitted) (emphasis added).  No such showing can be made here.

**<u>Conclusion</u>**

For the reasons set forth above, Petitioners respectfully request that the Court forthwith enter an Order directing the Clerk of the Court to unseal the Records at issue.

---

[6] However, the two sources of the right of public access are distinguishable.  *See, e.g., Custer Battlefield Museum*, 658 F.3d at 1197 n.7 (recognizing that The First Amendment provides "a stronger right of access than the common law").

Respectfully submitted this 2nd day of November, 2017.

By:  /s/ Joel E. Tasca

Joel Tasca, Esq.
Justin A. Shiroff, Esq.
BALLARD & SPAHR, LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

Attorneys for American Broadcasting Cos., Inc., Cable News Network, Inc., Chesapeake Media I, LLC, d/b/a KSNV-TV, Los Angeles Times Communications, LLC, The New York Times Company, and WP Company LLC d/b/a The Washington Post

By: /s/ Margaret A. McLetchie

Margaret A. McCletchie
Alina M. Shell
McLetchie Shell, LLC
701 E. Bridger Ave., Suite 520
Las Vegas, NV 89101

Attorneys for Las Vegas Review-Journal and Associated Press

**APPENDIX A**

1. Petitioner American Broadcasting Companies, Inc., alone or through its subsidiaries, owns and operates, *inter alia*, ABC News, abcnews.com, and local broadcast television stations which regularly gather and report news to the public. Programs produced and disseminated by ABC News include *World News with Diane Sawyer*, *20/20*, *Nightline*, *Good Morning America*, and *This Week*. It is based at 47 W. 66th St., New York, NY 10023.

2. Petitioner the Associated Press ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York, and is owned by its 1,500 U.S. newspaper members. The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and Internet content providers. The AP operates from 300 locations in more than 100 countries. On any given day, AP's content can reach more than half of the world's population. The AP's corporate headquarters are located at 200 Liberty St., New York, NY 10281. The AP also maintains a local Las Vegas office at 300 S. 4th St. #810, Las Vegas, NV 89101.

3. Petitioner Cable News Network, Inc. ('CNN") is a subsidiary of Turner Broadcasting System, Inc., a Time Warner Inc. company. CNN is a portfolio of two dozen news and information services across cable, satellite, radio, wireless devices and the Internet in more than 200 countries and territories worldwide. CNN is based at One CNN Center, Atlanta, GA 30303.

4. Petitioner Chesapeake Media I, LLC, d/b/a KSNV-TV owns and operates the KSNV-TV television station, which is the Las Vegas affiliate of The National Broadcasting Company. It is headquartered at 10706 Beaver Dam Road, Hunt Valley, MD 21030. The KSNV-TV station address is 1500 Foremaster Lane, Las Vegas, NV 89101.

5. Petitioner Las Vegas Review-Journal ("Review-Journal") is a daily newspaper, published in Las Vegas, Nevada, and is the largest circulation newspaper in Nevada. The Review-Journal carries on the constitutionally-protected business of reporting the news. It is based at 1111 W. Bonanza Rd, Las Vegas, NV 89106.

6. Petitioner Los Angeles Times Communications LLC, a subsidiary of tronc, inc.,

publishes the Los Angeles Times, California's largest newspaper, and a number of smaller community papers. The Times' website, www.latimes.com, is a leading source of California, national and international news. Los Angeles Times Communications LLC is based at 202 W. 1st St., Los Angeles, CA 90012.

7. Petitioner The New York Times Company is the owner of *The New York Times* and the *International New York Times*, formerly the *International Herald Tribune*, and operates the news website www.nytimes.com. The New York Times Company is based at 620 Eighth Avenue, New York, NY 10018.

8. Petitioner WP Company LLC d/b/a *The Washington Post* publishes one of the nation's most prominent daily newspapers, as well as a website, www.washingtonpost.com, that is read by an average of more than 20 million unique visitors per month. WP Company LLC is based at 1150 15th Street NW, Floor 11, Washington, DC 20017.